

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-10-2006

# USA v. Weaver

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1743

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation
"USA v. Weaver" (2006). *2006 Decisions.* Paper 1457.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1457

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-1743

_____

UNITED STATES OF AMERICA

v.

JOHN HENRY WEAVER,

Appellant.

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 03-cr-00337-2)
District Judge: Honorable Christopher C. Conner

_____

Submitted Under Third Circuit LAR 34.1(a)
March 3, 2006

Before: SLOVITER and FUENTES, <u>Circuit</u> <u>Judges</u>,
RESTANI[*], <u>International Trade Judge</u>

(Filed: March 10, 2006)

_____

OPINION

_____

_____

[*] Honorable Jane A. Restani, Chief Judge of the United States Court of
International Trade, sitting by designation.

RESTANI, <u>International Trade Judge</u>.

Appellant John Henry Weaver pleaded guilty to conspiring to engage in bribery in connection with a federally funded program, a violation of 18 U.S.C. § 371 (2000), and was sentenced to a term of thirty-six months in prison, followed by supervised release. Weaver appeals his sentence, which was imposed after the issuance of <u>United States v. Booker</u>, 543 U.S. 220 (2005).

## BACKGROUND

Weaver was employed by the Harrisburg School District ("the District") for 16 years, and at the time of the events relevant to this case was the District's director of information technology. In the spring of 2002, Weaver met Ronald Morrett when Morrett's company, EMO Communications, was awarded a contract to provide the District with approximately eight hundred laptop computers. A majority of the funds for the computers came from a federally funded program operated through the Federal Communications Commission, commonly referred to as "E-Rate". When Morrett originally submitted his bid, the specified computers cost approximately $7,600 per unit. The government, however, took over two years to approve the contract, and in the interim the cost of the computers dropped to between $1,600 and $1,700 per unit. Nevertheless, EMO's bid for the project was not amended and the government approved the purchase of computers at the $7,600 price.

After Morrett was awarded the contract, he and Weaver agreed that Morrett would pay kickbacks to Weaver. The payments began in April 2002 and continued until May 2003, during which time Weaver drew up phony invoices used by Morrett to justify the payments

2

made by EMO Communications. While the record is not clear as to who first proposed the scheme, Weaver admits that he initially agreed to accept a sum of $1 million from Morrett. In subsequent meetings with Morrett, the figure was revised to $1.4 million. Later, while meeting to discuss a discrepancy on one of the phony invoices prepared by Weaver, Morrett offered an additional payment and gave Weaver a $500,000 check for which no invoice was prepared. During the course of their arrangement, Morrett made approximately thirteen payments to Weaver – ranging from $5,000 to $660,000 – for a total of approximately $1,900,000.

While it appears that Weaver was under no obligation to report the change in computer prices to E-Rate, he was to some extent responsible for overseeing Morrett's performance of the contract. Specifically, on at least three occasions, representatives of E-Rate called Weaver to confirm whether Morrett was performing his contract. Weaver confirmed, truthfully, that he had received the computers.

With the exception of his arrangement with Morrett, Weaver has no criminal history. Weaver's health is deteriorating, and he is currently classified as "disabled" by the Social Security Administration.

At sentencing, the District Court, applying the 2003 U.S. Sentencing Guidelines Manual,[1] (the "Guidelines") imposed a base offense level of ten, and added sixteen levels for

---

[1] A defendant is sentenced under the version of the Guidelines effective on the date of sentencing, "unless doing so would expose the defendant to harsher penalties than were in effect at the time the crime was committed." United States v. Lennon, 372 F.3d 535, 539 (3d Cir. 2004). Because Weaver would be subject to a higher offense

3

the amount of the bribe plus two more for the acceptance of multiple bribes. That was reduced by three levels for acceptance of responsibility for an offense level of twenty-five. This being Weaver's first offense, his criminal history level was category I, resulting in fifty-seven to sixty months of incarceration (the statutory maximum for the offense). Upon a recommendation from the prosecutor, the court further reduced Weaver's sentence by six levels under Guideline § 5K1.1 for substantial assistance to the government, resulting in a range of thirty to thirty-seven months. The court declined to further depart downward under § 5K2.0 to reflect conditions not otherwise taken into account, and also declined to further depart for "aberrant behavior"under § 5K2.20.

On appeal, Weaver claims that the District Court erred in imposing the two level sentence enhancement for receipt of multiple bribes and in refusing to grant the downward departures.

## DISCUSSION

### I. The Court Properly Considered Objections to the Presentence Report

Weaver argues that, in imposing the multiple bribe enhancement under Guideline

level under the 2005 Guidelines, as compared with the version in effect at the time of the offense conduct, the District Court was correct to use an earlier version. However, the 2003 Guidelines Manual incorporates amendments made to the Guidelines up to and including November 5, 2003. Because Weaver's conduct ended in May of 2003, the 2002 Guideline Manual should have been used. This error does not affect the outcome of this case, as the relevant Guidelines provisions are the same in both versions.

4

§ 2C1.1, the District Court improperly relied on portions of the presentence report following his objection to some of the facts stated therein. Specifically, Weaver objected to the presentence report's statement that Weaver and Morrett "reached an understanding that Morrett would make kickback payments to Weaver in order to ensure that Weaver promptly processed the certifications which Morrett needed to obtain his draws." (Presentence Report ¶ 7.)

A district court "must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B) (2005). The party challenging the presentence report bears the burden to produce "evidence that tends to indicate that the report is incorrect or incomplete." United States v. McDowell, 888 F.2d 285, 290 n.1 (3d Cir. 1989). The ultimate burden of persuasion rests on the party seeking to adjust the sentence, in this case the government. Id. at 291. We review the District Court's finding of fact for clear error. Id. at 292.

At sentencing, Weaver testified that Morrett had already begun to receive payments from E-Rate when he made his arrangement with Weaver. This testimony calls into question whether Morrett needed Weaver's certification in order to obtain payment from E-Rate. During direct examination by the judge, however, Weaver admitted his responsibilities in the E-Rate program, including the fact that he responded to at least three "audit calls" from the E-Rate office regarding Morrett's performance of the contract. Likewise, cross examination

5

revealed the following admission:

A:    Well, from time to time the E-Rate company would call and ask if we received what he were [sic] contracted for. I told them yes.
Q:    So you would provide information that would form the basis for payments to Mr. Morrett?
A:    Not all the time, no, sir.
Q:    But on a number of occasions?
A:    On a number of occasion [sic], yes.

(Sentencing Hr'g Tr. 22:5–12, Mar. 1, 2005.) The fact that payment had begun prior to Weaver's acceptance of the bribe does not contradict the District Court's conclusion that future payments were contingent on Weaver's response to E-Rate's telephone inquiries; indeed, Weaver agreed that such calls "form[ed] the basis of payments to Mr. Morrett" on a number of occasions.[2] We therefore detect no clear error in the District Court's finding that "[i]f the defendant failed to approve a specific project I have no doubt that Mr. Morrett would have withheld payment." (Sentencing Hr'g Tr. 34:25–35:2.) We conclude that the District Court made the necessary factual finding in response to Weaver's objection under Fed. R. Cr. P. 32(i)(3)(B).

## II.    Weaver's Conduct Constituted the Acceptance of Multiple Bribes

Weaver argues that his conduct was "essentially, a single bribe over a period of time,"

---

[2] Weaver also admitted at his plea hearing to the charge that "Mr. Morrett and his company would receive progress payments under the contract only after the school district, through Mr. Weaver, had certified their completion of aspects of the contract." (Plea Hr'g Tr. 28:23–29:2, Dec. 1, 2003.) We hold Weaver to his word at sentencing. See United States v. Dickler, 64 F.3d 818, 824 n.7 (3d Cir. 1995) ("We have held that facts relevant to sentencing contained in the indictment and plea agreement are conclusively established by the entry of a guilty plea even if they are not elements of the offense charged.") (citing United States v. Parker, 874 F.2d 174, 178 (3d Cir. 1989)).

and that the District Court erred in imposing a two offense level increase in his sentence for the acceptance of multiple bribes under Guideline § 2C1.1(b)(1).

We review the District Court's legal conclusion that Weaver's conduct constituted multiple bribes de novo and the court's findings of fact supporting that conclusion for clear error. United States v. Rudolph, 137 F.3d 173, 176 (3d Cir. 1998). Guideline § 2C1.1(b)(1) imposes a two level sentence enhancement for receipt of "more than one bribe or extortion." The Commission's commentary provides that "[r]elated payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts." Guideline § 2C1.1 cmt. n.6.

In making its determination, the District Court relied in part on the Second Circuit's interpretation of § 2C1.1 in Arshad v. United States, 239 F.3d 276 (2d Cir. 2001). The Arshad court identified several factors commonly applied to determine if a payment, or payments, constitute multiple bribes, including: 1) whether the payments were "made to influence a single action," id. at 280 (citing, inter alia, United States v. Middlemiss, 217 F.3d 112, 124 (2d Cir. 2000); United States v. Martinez, 76 F.3d 1145, 1153–54 (10th Cir. 1996)); 2) "whether the pattern and amount of payments bear the hallmarks of installment payments, such as a regular schedule of payments over a finite period of time toward a fixed final sum, rather than a series of intermittent and varied bribes," Arshad, 239 F.3d at 281–82 (citing Middlemiss, 217 F.3d at 124; Martinez, 76 F.3d at 1153; United States v. Morales, 11 F.3d 915, 917 (9th Cir. 1993)); and 3) "whether the method for making each payment remains the

7

same." Arshad, 239 F.3d at 282 (citing Morales, 11 F.3d at 917).

Arshad was a contractor who received a $300,000 contract to paint public housing units in New York. Id. at 278. The state employed an inspector who was responsible for overseeing contractors working on public housing projects and penalizing contractors who performed inadequately. Id. Arshad sought to bribe the state inspector for three purposes: to overlook deficient performance, authorize additional work hours, and expedite approval of payment for Arshad's completed work. Id. at 280–81. Arshad argued that his conduct did not constitute multiple bribes because, although he had offered bribes to the same state employee for different purposes, the bribes were all designed to "obtain insulation from an overly rigorous inspection regime." Id. at 281. Arshad also argued that his payments were "installment payments," not multiple bribes, because they were made "at a fixed rate of $10 per apartment," always paid through the same method, and always given to the same inspector. Id. at 282. The court in Arshad gave the first factor primary weight, finding that "the payments were . . . intended to achieve several distinct benefits for Arshad and were therefore more than one bribe irrespective of their manner of payment." Id. at 282.

Weaver claims that, unlike Arshad, he did not accept multiple bribes because there was insufficient evidence to conclude that progress payments to Morrett were directly related to kickback payments to Weaver. Even if we were to find that this counseled against finding multiple bribes, this would not lead ineluctably to the conclusion that only one bribe took place. As the court in Arshad noted, that "the existence of multiple payees and payment methods may demonstrate the existence of multiple bribes." Id. at 282 (citing Morales, 11

8

F.3d at 917). The payments from Morrett to Weaver do not bear any hallmarks of installment payments as noted in the comments to Guideline § 2C1.1. The approximately thirteen individual payments varied from $5,000 to over $600,000. The amount of compensation Weaver received continued to grow over the course of his relationship with Morrett. An initial request for $1 million later became $1.4 million, which was supplemented by an additional $500,000 at the end of the scheme. Thus, the payments followed neither a "regular schedule," nor a progression toward a "final fixed sum." Likewise, the method of payment varied considerably – money was given directly to Weaver, then channeled through relatives, and then directed through a corporation controlled by Weaver.[3] These facts point strongly toward the conclusion that Weaver accepted multiple bribes.

It is a closer question whether the numerous payments to Weaver were made for the purposes of influencing a "single action" or, as the District Court found, "multiple discrete acts." Unlike Arshad, this case involves bribes related to only one type of action – Weaver's response to calls from E-Rate. Nevertheless, there is nothing in § 2C1.1 requiring us to find that separate payments prompting an official to perform the same action on three different occasions cannot constitute multiple bribes. As discussed above, Weaver's own testimony at his sentencing demonstrates that at least some of the payments from E-Rate to Morrett

_____

[3] Weaver also argues that this case differs from Arshad in that he never accepted payment in return for overlooking deficient or substandard services from Morrett. Whether a person offering a bribe provided substandard service has no bearing on whether the scheme involved multiple bribes.

9

were conditioned on Weaver's response to E-Rate's inquiries. Furthermore, the schedule of payments suggests that Weaver was paid intermittently for the performance of discrete acts. It is particularly difficult to reconcile the fact that Weaver received an additional $500,000 from Morrett near the end of the contract (with about 110 computers remaining for delivery) with the argument that these payments all contemplated performance of the same action. Weaver had already received the agreed-upon $1.4 million payment for the prior shipments, which indicates that the $500,000 must have been given for some other purpose. While the matter is not free from doubt, we find no clear error in the District Court's factual conclusion that the payments were made intermittently to influence more than one act by Weaver. Given these three factual conclusions – that the bribes increased over time, that the payments varied in amount and delivery method, and that Weaver performed multiple acts – we conclude that Weaver accepted multiple bribes under Guideline § 2C1.1.

## III.  The District Court's Sentence Was Reasonable

Weaver briefly contends that the two-level enhancement should have been proven beyond a reasonable doubt, rather than decided by a preponderance of the evidence.

The Supreme Court has held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). Interpreting Apprendi, courts initially followed the usual and ordinary meaning of "statutory maximum," allowing a judge to find facts at sentencing by a

10

preponderance of the evidence so long as a sentence greater than that permitted by the underlying criminal statute did not result. See United States v. West, 392 F.3d 450, 459 (D.C. Cir. 2004). The Court's opinion in Blakley v. Washington, 542 U.S. 296 (2004), however, clarified that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 303.

Weaver contends that under the Blakely definition of "statutory maximum," he was entitled to have the facts supporting his two-level enhancement found beyond a reasonable doubt because they affected his sentence. Such a conclusion would effectively ignore the second half of the Court's opinion in United States v. Booker, 543 U.S. at 245, which cured the Sixth Amendment infirmities of the Guidelines by rendering them advisory. By making the Guidelines advisory, the Court ensured that a jury conviction or admission of guilt supports a sentence at any level within the statutory range, provided such sentence is "reasonable." Id. at 261. So long as the judge sentences a defendant within the statutory range supported by a guilty verdict or admission of guilt (save for a finding of a prior conviction) the judge has not imposed a sentence in excess of the "statutory maximum" as defined by Booker.

Therefore, "[a]s before Booker, the standard of proof under the guidelines for sentencing facts continues to be preponderance of the evidence." United States v. Cooper, No. 05-1447, 2006 WL 330324, at *4 (3d Cir. Feb. 14, 2006) (citing United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005), cert. denied, 126 S.Ct. 43 (2005)).

11

Weaver pleaded guilty to a violation of 18 U.S.C. § 371, which carries a maximum penalty of five years. His sentence therefore does not exceed the "statutory maximum" and the District Court properly applied a preponderance of the evidence standard to facts surrounding the two-level enhancement.

Following United States v. Booker, we also review Weaver's sentence for reasonableness under 18 U.S.C. § 3742(a)(1). See Cooper, 2006 WL 330324, at *2 n.4. Our evaluation of reasonableness begins with the trial court's calculation of the correct sentencing guidelines range. Cooper, 2006 WL 330324, at *4. Second, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors." Cooper, 2006 WL 330324, at *3. If the District Court did consider the § 3553(a) factors, we must then, giving deference to the sentencing court, determine "'whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section 3553(a).'" Cooper, 2006 WL 330324, at *4 (quoting United States v. Williams, 425 F.3d 478, 481 (7th Cir. 2005), cert. denied, 126 S.Ct. 1182 (2006)). A rote recitation of the § 3553(a) factors is not necessary, nor does such a recitation demonstrate reasonableness. Cooper, 2006 WL 330324, at *3.

The District Court correctly calculated the sentencing range suggested by the Guidelines applicable in this case. We note that the sentence imposed was within the guideline range, which weighs in favor of a finding of reasonableness. Cooper, 2006 WL 330324, at *4. The District Court mentioned that it considered all of the § 3553(a) factors, and that the sentence imposed "satisfies the purposes" of that section. Additionally, the

12

District Court considered Weaver's age, medical condition, and financial circumstances, noting that it imposed this sentence "in light of the nature of the defendant's offense and his lack of any criminal history" and also because he had "already received a significant departure for substantial assistance to authorities based partly on his medical condition." (Sentencing Hr'g Tr. 61:20–23, 65:13–14.) The record demonstrates that the District Court considered all of the § 3553(a) factors and reasonably applied them to this case. We therefore conclude that Weaver's sentence was reasonable.

## III. The Court Lacks Jurisdiction to Review The District Court's Discretionary Decision not to Depart Downward

We have jurisdiction to review errors of law made applying the Guidelines, but lack jurisdiction under 18 U.S.C. §3742(a) to review the District Court's discretionary refusal to grant a downward departure. United States v. Torres, 251 F.3d 138, 145 (3d Cir. 2001). Although Booker excised the portion of the Sentencing Reform Act setting the standard of review of sentencing on appeal, 18 U.S.C. § 3742(e), it left in place § 3742(a), which provides for appellate review of sentences. 543 U.S. at 265. The principle that § 3742(a) does not grant us jurisdiction to review discretionary decisions against downward departures therefore remains intact. Cooper, 2006 WL 330324, at *6 ("We follow the Courts of Appeals

for the First, Sixth, Eighth, Tenth and Eleventh Circuits in declining to review, after <u>Booker</u>, a district court's decision to deny departure.").

There is no indication that the District Court misinterpreted the law regarding downward departures or refused to exercise its discretion. The court clearly stated that: "recognizing the authority to depart for the reasons outlined by defense counsel, the court exercises its discretion not to do so under the circumstances of this case." We therefore lack jurisdiction to review the District Court's discretionary decision not to depart from the minimum sentence range suggested by the advisory guidelines.

Accordingly, the sentence imposed by the District Court is AFFIRMED.